RCD  12 - 20 - 07

STATE OF MINNESOTA      FILED PSL      DISTRICT COURT

COUNTY OF HENNEPIN    07 DEC 14  PH 2: 55    FOURTH JUDICIAL DISTRICT

                   HENN.CO. DISTRICT
                   COURT MPLS PROCESSING

Medtronic, Inc. and Medtronic USA, Inc.,        Case Type: Contract

       Plaintiffs,                  Court File No. _____

vs.

                             SUMMONS

Endologix, Inc., Albert Rotondo, and Brooke
L. Keeler,

       Defendants.

**THE STATE OF MINNESOTA TO THE ABOVE-NAMED DEFENDANTS:**

       You are hereby summoned and required to serve upon Plaintiffs' attorneys an answer to

the Complaint that is herewith served upon you within twenty (20) days after service of this

Summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default

will be taken against you for the relief demanded in the Complaint.  All civil cases are subject to

Alternative Dispute Resolution (ADR) processes, except for those actions enumerated in Minn.

Stat. § 484.76 and Minnesota General Rules of Practice 111.01 and 310.01.  Alternative dispute

resolution procedures are set forth in Minnesota General Rules of Practice, Rule 114.

Dated: December 14, 2007        MASLON EDELMAN BORMAN & BRAND, LLP

                          By: _____
                              William Z. Pentelovitch (#85078)
                              Mary R. Vasaly (#152523)
                              Wayne S. Moskowitz (#17936X)
       3300 Wells Fargo Center
       90 South Seventh Street
       Minneapolis, Minnesota 55402
       (612) 672-8200

       **ATTORNEYS FOR PLAINTIFFS**
       **MEDTRONIC, INC. and**
       **MEDTRONIC USA, INC.**

# EXHIBIT A

STATE OF MINNESOTA                    *FILED PSL*              DISTRICT COURT

COUNTY OF HENNEPIN          07 DEC 14  PH 2: 55    FOURTH JUDICIAL DISTRICT

Medtronic, Inc. and Medtronic USA, Inc.,                         Case Type: Contract

                Plaintiffs,                               Court File No. _____

vs.

Endologix, Inc., Albert Rotondo, and Brooke            **COMPLAINT**
L. Keeler,

                Defendants.

For their Complaint against Defendants, Plaintiffs Medtronic, Inc. and Medtronic USA,
Inc. state and allege as follows:

### THE PARTIES

1.    Plaintiff Medtronic, Inc. is a Minnesota corporation with its principal place of
business in Anoka County, Minnesota.

2.    Plaintiff Medtronic USA, Inc., a wholly owned subsidiary of Medtronic, Inc., is a
Minnesota corporation with its principal place of business in Anoka County, Minnesota.
Medtronic USA, Inc. is the employer of Medtronic, Inc.'s CardioVascular business unit's sales
force.  Plaintiffs are collectively referred to herein as "Medtronic."

3.    Defendant Endologix, Inc. ("Endologix") is a publicly held Delaware corporation
with its principal place of business in Irvine, California.  Endologix is a direct competitor of
Medtronic's CardioVascular business unit.

4.    Defendant Albert Rotondo is an individual residing in Rockville Centre, New
York.  Rotondo was employed by Medtronic as a senior sales representative in its

CardioVascular business unit until he voluntarily resigned to work for Endologix in violation of his Medtronic Employee Agreement.

5.     Defendant Brooke L. Keeler ("Keeler") is an individual residing in Marshfield, Massachusetts.   Keeler was employed by Medtronic as a senior sales representative in its CardioVascular business unit until she voluntarily resigned to work for Endologix in violation of her Medtronic Employee Agreement.

## BACKGROUND

### Medtronic

6.     Medtronic is a diversified medical technology company, specializing in implantable and interventional therapies for treating a wide variety of diseases and disorders. One of Medtronic's three key business units, its CardioVascular business unit, researches, designs, develops, manufactures, markets and sells products and therapies used by physicians to treat coronary artery, vascular, and structural heart disease.  Medtronic's CardioVascular business unit is comprised of four organizations: (I) Coronary and Peripheral;  (2) Structural Heart Disease; (3) Revascularization and Surgical Therapies; and (4) Endovascular Innovations.

7.     Defendants Rotondo and Keeler were employed as sales representatives for Medtronic's Endovascular Innovations organization, which develops, markets and sells products used to treat aortic aneurysms, including endovascular stent grafts and stent graft balloon catheters. "Endovascular" means "inside blood vessels." An endovascular stent graft is a small tube composed of fabric, supported by a metal mesh called a "stent."  They are typically used to reinforce a weak spot in an artery, called an aneurysm, to help prevent it from bursting.  The aorta runs through the chest and abdomen, distributing blood from the heart to the rest of the body.  Physicians, typically vascular surgeons, but also interventional radiologists, interventional

2

cardiologists, and cardiac surgeons, use endovascular stent grafts to treat abdominal aortic aneurysms, but they can also be used to treat thoracic aortic aneurysms.

8.      Medtronic devotes significant resources towards the research, design, development, marketing and sale of state-of-the-art aortic aneurysm products.  The primary customers and decision-makers are the vascular surgeons, interventional radiologists, interventional cardiologists, and cardiac surgeons who use the products in connection with endovascular aortic repair procedures.  These medical specialists, or those who support them such as nurses, technicians and administrators, either order aortic aneurysm products directly, or through the hospitals, surgery centers, and other medical facilities and offices where they work.

9.      Medtronic's success depends in large part upon maintaining a stable endovascular sales force that is well-trained and has strong personal relationships of trust and confidence with its physician-customers, as well as with other personnel who influence the purchasing decisions of medical facilities.  These customer relationships are critical to the successful marketing and sale of Medtronic's aortic aneurysm products.  Medtronic's physician-customers rely on Medtronic's sales representatives to train them on the use of Medtronic's aortic aneurysm products, and to provide important technical and consultative services before and during the implant procedure.  Medtronic devotes significant resources towards training its sales representatives and assisting them in developing strong, long-term relationships with its customers.

### The Rotondo Employee Agreement

10.      Medtronic first employed Rotondo in December 2000 as a vascular sales representative, and later as an endovascular sales representative, for Medtronic's  Long Island territory.  In May, 2006, Rotondo voluntarily resigned from Medtronic to work for EV3, a company that sold peripheral stents.

3

11.     Less than one year after resigning, Rotondo re-applied for Medtronic

employment, and Medtronic re-hired him. Attached as Exhibit A is a true and correct copy of

Medtronic's December 15, 2006, offer of employment to Mr. Rotondo for the position of Senior

Endovascular Sales Representative. Attached as Exhibit B is a true and correct of Mr. Rotondo's

Medtronic Employee Agreement ("Rotondo Employee Agreement"), signed by him on

December 29, 2006. Rotondo subsequently re-commenced employment with Medtronic as a

senior sales representative for Medtronic's Endovascular Innovations group on or about January

15, 2007.

12.     Paragraph 4.1 of the Rotondo Employee Agreement provides, in relevant part, as

follows:

> **Restrictions on Competition.** * * * If, however, during the last
> twelve (12) months of employment with MEDTRONIC, Employee
> had no management duties or responsibilities and was engaged
> exclusively in sales activities, including selling, soliciting the sale,
> or supporting the sale of MEDTRONIC PRODUCTS through
> direct contact with MEDTRONIC CUSTOMERS, this restriction
> will be for a duration of only one (1) year after the last day
> Employee is employed by MEDTRONIC, and will prohibit
> Employee only from soliciting, selling to, contacting, or attempting
> to divert business from, whether directly or by managing, directing
> or supervising others, any MEDTRONIC CUSTOMER on behalf
> of a CONFLICTING ORGANIZATION in connection with or
> relating to a COMPETITIVE PRODUCT. . . .

Rotondo was engaged exclusively in sales activities within the meaning of Paragraph 4.1 of the

Rotondo Employee Agreement.

13.     Paragraph 1.7 of the Rotondo Employee Agreement defines "Medtronic

Customer(s)" as follows:

> **MEDTRONIC CUSTOMER(S)** means any person, entity or
> institution, including the employees, agents or representatives who
> controlled, directed or influenced the purchasing decisions of any
> such person, entity or institution, to whom or to which Employee
> sold, negotiated the sales, supported, marketed or promoted

4

products or services on behalf of MEDTRONIC during the last
one (1) year in which Employee was employed by MEDTRONIC

14.    Paragraph 1.1 of the Rotondo Employee Agreement defines "Competitive

Product" as follows:

> COMPETITIVE PRODUCT means goods, products, product
> lines or services, and each and every component thereof,
> developed, designed, produced, manufactured, marketed,
> promoted, sold, supported, serviced, or that are in development or
> the subject of research by anyone other than MEDTRONIC that
> are the same or similar, perform any of the same or similar
> functions, may be substituted for, or are intended or used for any of
> the same purposes as a MEDTRONIC PRODUCT.

15.    Paragraph 1.8 of the Rotondo Employee Agreement defines "Medtronic

Product(s)" as follows:

> MEDTRONIC PRODUCT(S) means any goods, products, or
> product lines (a) that the services the Employee (or persons under
> Employee's management, direction or supervision) performed for
> MEDTRONIC related to, directly or indirectly, during the last
> one (1) year in which the Employee was employed by
> MEDTRONIC, including without limitation services in the areas
> of research, design, development, production, manufacture,
> marketing, promotion, sales, or business, technical, regulatory or
> systems research, analysis, planning or support relating to such
> goods, products, or product lines, or (b) with respect to which
> Employee at any time received or otherwise obtained or learned
> CONFIDENTIAL INFORMATION.

16.    Paragraph 1.4 of the Rotondo Employee Agreement defines "Conflicting

Organization" as follows:

> CONFLICTING ORGANIZATION means any person
> (including the Employee) or entity, and any parent, subsidiary,
> partner, or affiliate (regardless of their legal form) of any person or
> entity, that engages in, or is about to become engaged in, the
> development, design, production, manufacture, promotion,
> marketing, sale, support, or service of a COMPETITIVE
> PRODUCT . . . .

5

17.     Paragraph 5.1 of the Rotondo Employee Agreement provides that, subject to express terms and conditions, Medtronic will compensate Rotondo if he is unable to accept a bona fide offer of employment because of the restrictive covenant in Paragraph 4.1

18.     Paragraph 4.2 of the Rotondo Employee Agreement prohibits Rotondo, for one year from termination of employment, from soliciting or participating in or promoting the solicitation of any person to terminate that person's employment with Medtronic.

19.     Paragraph 7.2 of the Rotondo Employee Agreement provides that Minnesota law governs its "validity, enforceability, construction and interpretation."

20.     Paragraph 7.3 of the Rotondo Employee Agreement provides that "[a]ny dispute arising out of or related to this Agreement, or any breach or alleged breach hereof, shall be exclusively decided by a state court in the State of Minnesota," and that Rotondo consents to personal jurisdiction in Minnesota.

### The Keeler Employee Agreement

21.     On or about December 30, 2003, Medtronic made a written offer of employment to Keeler (*nee* Adams), a true and correct copy of which is attached as Exhibit C. Medtronic's offer stated that a condition of employment was her signing Medtronic's Employee Agreement, which was enclosed for Keeler's review. Keeler signed the agreement (the "Keeler Employee Agreement") on January 5, 2004, and returned the signed agreement to Medtronic. A true and correct copy of the Keeler Employee Agreement is attached as Exhibit D. Keeler subsequently commenced employment with Medtronic as a sales representative for Medtronic's Endovascular Innovations group on or about February 2, 2004.

22.     Paragraph 4.1 of the Keeler Employee Agreement provides, in relevant part, as follows:

6

> **Restrictions on Competition.** * * * If, however, during the last
> twelve (12) months of employment with MEDTRONIC, Employee
> had no management duties or responsibilities and was engaged
> exclusively in sales activities, including selling, soliciting the sale
> or supporting the sale of MEDTRONIC PRODUCTS through
> direct contact with MEDTRONIC CUSTOMERS, this restriction
> will be for a duration of only one (1) year after the last day
> Employee is employed by MEDTRONIC, and will prohibit
> Employee only from soliciting, communicating with or contacting,
> and from managing, directing or supervising others who solicit,
> communicate with or contact, any MEDTRONIC CUSTOMER on
> behalf of a CONFLICTING ORGANIZATION in connection with
> or relating to a COMPETITIVE PRODUCT . . . .

Keeler was engaged exclusively in sales activities within the meaning of Paragraph 4.1 of the

Keeler Employee Agreement.

     23.    Paragraph 1.4 of the Keeler Employee Agreement defines "Conflicting

Organization" as follows:

> **CONFLICTING ORGANIZATION** means any person
> (including the Employee) or entity, and any parent, subsidiary,
> partner, or affiliate (regardless of their legal form) of any person or
> entity, that engages in, or is about to become engaged in, the
> development, design, production, manufacture, promotion,
> marketing, sale, support, or service of a COMPETITIVE
> PRODUCT . . . .

     24.    Paragraph 1.1 of the Keeler Employee Agreement defines "Competitive Product"

as follows:

> **COMPETITIVE PRODUCT** means goods, products, product
> lines or services, and each and every component thereof,
> developed, designed, manufactured, marketed, promoted, sold,
> supported, serviced, or that are in development or the subject of
> research by anyone other than MEDTRONIC that are the same or
> similar, perform any of the same or similar functions, may be
> substituted for, or are intended or used for any of the same
> purposes as a MEDTRONIC PRODUCT.

     25.    Paragraph 1.8 of the Keeler Employee Agreement defines "Medtronic Product" as

follows:

7

**MEDTRONIC PRODUCT(S)** means any goods, products, product lines or services (a) that during the last one (1) year in which the Employee was employed by MEDTRONIC, Employee, or persons under Employee's management, direction or supervision, performed research regarding, designed, developed, produced, manufactured, marketed, promoted, sold, solicited sales of, supported, serviced, or provided on behalf of MEDTRONIC, or (b) with respect to which Employee at any time received or otherwise obtained or learned CONFIDENTIAL INFORMATION.

26.     Paragraph 4.2 of the Keeler Employee Agreement prohibits Keeler, for one year from termination of employment, from soliciting or participating in or promoting the solicitation of any person to terminate that person's employment with Medtronic.

27.     Paragraph 7.2 of the Keeler Employee Agreement provides that Minnesota law governs its "validity, enforceability, construction and interpretation."

28.     Paragraph 7.3 of the Keeler Employee Agreement provides that "[a]ny dispute arising out of or related to this Agreement, or any breach or alleged breach hereof, shall be exclusively decided by a state court in the State of Minnesota," and that Keeler consents to personal jurisdiction in Minnesota.

29.     Paragraph 5.1 of the Keeler Employee Agreement provides that, subject to express terms and conditions, Medtronic will compensate Keeler if she is unable to accept a bona fide offer of employment because of the restrictive covenant in Paragraph 4.1

<u>Rotondo's and Keeler's Acquisition of Medtronic's</u>
<u>Confidential Information and Customer Goodwill</u>

30.     During her last year of Medtronic employment, Keeler's territory consisted of the following accounts and affiliated physicians:

| HOSPITAL | CITY | STATE |
|---|---|---|
| South Shore Hospital | South Weymouth | MA |
| St. Anne's Hospital | Fall River | MA |
| Lowell General Hospital | Lowell | MA |
| Brigham Women Hospital | Boston | MA |

8

| | | |
|---|---|---|
| Caritas Good Samaritan Medical | Brockton | MA |
| Metro West Medical Center | Natick | MA |
| Emerson Hospital | Concord | MA |
| Falmouth Hospital | Falmouth | MA |
| Massachusetts General Hospital | Boston | MA |
| Beverly Hospital | Beverly | MA |
| Boston Medical Center | Boston | MA |
| Saints Memorial Medical Center | Lowell | MA |
| Metrowest Heart Center | Framingham | MA |
| Leonard Morse Campus Metrowest | Natick | MA |
| Cape Cod Hospital | Hyannis | MA |
| Caritas Carney Hospital | Dorchester | MA |
| Caritas St. Elizabeths Medctr Of | Boston | MA |
| Caritas St. Elizabeths Of Brighton | Brighton | MA |
| The Heart Center Of Metrowest | Framingham | MA |
| Charlton Memorial Hospital | Fall River | MA |
| Newton Wellesley Hospital | Newton Lower Falls | MA |
| Jordan Hospital | Plymouth | MA |
| Lahey Clinic Hospital | Burlington | MA |

31.     Keeler's responsibilities included calling on each of these accounts on a regular

basis. Keeler sold, supported, marketed or promoted Medtronic's endovascular products to each

of her accounts during her last year of Medtronic employment.

32.     During his last year of Medtronic employment Rotondo's territory consisted of

the following accounts and affiliated physicians:

| HOSPITAL | CITY | STATE |
|---|---|---|
| St. Francis Hospital | Roslyn | NY |
| Lutheran Medical Center | Brooklyn | NY |
| Wyckoff Heights Medical Center | Brooklyn | NY |
| Peninsula Hospital Center | Far Rockaway | NY |
| Maimonides Medical Center | Brooklyn | NY |
| Flushing Hospital Medical Center | Flushing | NY |
| Bimc Kings Highway Division Medical | Brooklyn | NY |
| Brooklyn Hospital Center | Brooklyn | NY |
| New York Methodist Hospital | Brooklyn | NY |
| North Shore U Hospitals | New Hyde Park | NY |
| New York Hosp And Medical Ctr Of | Flushing | NY |
| North Shore U Hospital Forest Hills | Forest Hills | NY |
| Staten Isl North & South Campus | Staten Island | NY |
| Suny Downstate Medical University | Brooklyn | NY |
| Coney Island Hospital | Brooklyn | NY |
| Long Beach Medical Center | Long Beach | NY |
| Long Island Jewish Schneider | New Hyde Park | NY |

9

| | | |
|---|---|---|
| Vamc 527 Brooklyn | Brooklyn | NY |
| Huntington Hospital | Long Island | NY |
| Brookhaven Memorial Medical Center | East Patchogue | NY |
| Richmond University Medical Center | Staten Island | NY |
| Winthrop University Hospital | Mineola | NY |
| Good Samaritan Hospital Medical | West Islip | NY |
| Southside Hospital | Bayshore | NY |
| St. Catherine Of Siena Hospital | Smithtown | NY |
| Suny University Stony Brook | Stony Brook | NY |
| Vamc 632 Northport | Northport | NY |
| New-Island Hospital | Bethpage | NY |
| John T Mather Memorial Hospital | Port Jefferson | NY |
| North Shore U Hospital Plainview | Plainview | NY |
| Kings County Hospital Center | Brooklyn | NY |

33.     Rotondo's responsibilities included calling on each of these accounts on a regular

basis. Rotondo sold, supported, marketed or promoted Medtronic's endovascular products to

each of his accounts during his last year of Medtronic employment.

34.     As Medtronic sales representatives, Rotondo and Keeler developed strong

relationships with Medtronic's customers in their territories. In addition, Keeler and Rotondo

also received, developed and had access to Medtronic's confidential business information. For

example, they each had access to a password-protected secure website containing highly

sensitive and confidential analytical data concerning customers and sales in their territories,

which they used for purposes of marketing and selling Medtronic's endovascular products.

35.     In addition, Rotondo was one of a select number of endovascular sales

representatives appointed to the Executive Sales Council. As a result of his participation in the

Executive Sales Council, Rotondo was made privy to Medtronic's highly confidential

information including Endovascular Innovations' (a) long-term strategic plan; (b) confidential

launch strategy for its next generation endovascular stent graft, which has not yet been market-

released; (c) future marketing and competitive strategies, including strategies specifically

directed at competing with Endologix; (d) in-depth information about future products in its

10

From: 1      Page: 4/9      Date: 12/20/2007 4:06:47 PM

product pipeline, including specific planned features of those products; and (e) its future pricing strategies.

## Defendants' Violations of and Interference With the Employee Agreements

36.    On September 4, 2007, Keeler voluntarily resigned to work as a sales representative for Endologix in her former Medtronic sales territory.  On September 6, 2007, Rotondo voluntarily resigned his Medtronic employment to work as regional manager for Endologix, with responsibilities for his former Medtronic sales territory.  Endologix is Medtronic's direct competitor throughout the United States in the development, design, manufacture, marketing and sale of aortic aneurysm products.  Upon information and belief, the only products that Endologix markets and sells in the United States are aortic aneurysm products.

37.    Endologix's aortic aneurysm products are "Competitive Products" under the Rotondo and Keeler Employee Agreements.  Endologix is a "Conflicting Organization" under the Rotondo and Keeler Employee Agreements, because it is engaged in development, design, manufacture, marketing and sale of "Competitive Products."

38.    By a letter dated September 17, 2007, a true and correct copy of which is attached hereto as Exhibit E, Medtronic reminded Keeler of her obligations under her Medtronic Employee Agreement, and identified the accounts covered by her covenant not to compete.

39.    By a letter dated September 19, 2007, a true and correct copy of which is attached hereto as Exhibit F, Medtronic reminded Rotondo of his obligations under his Medtronic Employee Agreement, and identified the accounts covered by his covenant not to compete.

40.    Keeler has been communicating with her former Medtronic customers on behalf of her new employer, Endologix, in violation of her covenant not to compete, including

physicians affiliated with Saints Memorial Medical Center, Massachusetts General Hospital, Cape Cod Hospital, and Falmouth Hospital.

41.     Rotondo has violated his covenant not to compete by managing, directing or supervising Endologix representatives who are soliciting, selling to, or contacting his former Medtronic customers, and by directly communicating with his former Medtronic customers on behalf of Endologix, including physicians affiliated with St. Francis Hospital and North Shore University Hospital.

42.     Since becoming employed by Endologix, Keeler and Rotondo have each solicited a Medtronic endovascular sales representative to terminate her Medtronic employment and become employed by Endologix.

## CLAIMS FOR RELIEF

### Count One
### (Against Keeler for Breach of Contract)

43.     Plaintiffs repeat and reallege each every allegation contained in paragraphs 1 through 42 hereinabove.

44.     All conditions precedent under the Keeler Employee Agreement have occurred.

45.     The Keeler Employee Agreement is supported by consideration and is reasonable and necessary to protect Medtronic's legitimate business interests.

46.     Keeler has breached Paragraph 4.1 of the Keeler Employee Agreement by soliciting, communicating with or contacting "Medtronic Customers" on Endologix's behalf in connection with or relating to a "Competitive Product" within one year of her termination of Medtronic employment.

47.     Keeler has breached Paragraph 4.2 of the Keeler Employee Agreement by soliciting a Medtronic employee to terminate that person's employment with Medtronic.

12

48.     Medtronic lacks an adequate remedy at law for Keeler's breaches of the Keeler Employee Agreement, which threaten Medtronic with irreparable harm, including the misappropriation of its confidential information and injury to its customer goodwill.

49.     By reason of the foregoing, Medtronic is entitled to injunctive relief restraining Keeler from working for Endologix in violation of the Keeler Employee Agreement, restraining Keeler from soliciting Medtronic employees in violation of the Keeler Employee Agreement, and requiring Keeler to disgorge all profits earned by virtue of her breach of the Agreement.

### Count Two
### (Against Rotondo for Breach of Contract)

50.     Plaintiffs repeat and reallege each every allegation contained in paragraphs 1 through 49 hereinabove.

51.     All conditions precedent under the Rotondo Employee Agreement have occurred.

52.     The Rotondo Employee Agreement is supported by consideration and is reasonable and necessary to protect Medtronic's legitimate business interests.

53.     Rotondo has breached Paragraph 4.1 of the Rotondo Employee Agreement by soliciting, communicating with or contacting "Medtronic Customers" on Endologix's behalf in connection with or relating to a "Competitive Product" within one year of his termination of Medtronic employment.

54.     Rotondo has breached Paragraph 4.1 of the Rotondo Employee Agreement by managing, directing or supervising others who are soliciting, selling to, contacting, or attempting to divert business from "Medtronic Customers" on Endologix's behalf in connection with or relating to a "Competitive Product" within one year of his termination of Medtronic employment.

13

55.   Rotondo has breached Paragraph 4.2 of the Rotondo Employee Agreement by soliciting a Medtronic employee to terminate that person's employment with Medtronic.

56.   Medtronic lacks an adequate remedy at law for Rotondo's breaches of the Rotondo Employee Agreement, which threaten Medtronic with irreparable harm, including the misappropriation of its confidential information and injury to its customer goodwill.

57.   By reason of the foregoing, Medtronic is entitled to injunctive relief restraining Rotondo from working for Endologix in violation of the Rotondo Employee Agreement, restraining Rotondo from soliciting Medtronic employees in violation of the Keeler Employee Agreement, requiring Rotondo to disgorge all profits earned by virtue of his breach of the Agreement.

### Count Three
**(Against Endologix for Tortious Interference With Contract)**

58.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 57 hereinabove.

59.   Endologix had knowledge of the Rotondo and Keeler Employee Agreements.

60.   With knowledge of the terms of her agreement, Endologix intentionally and unjustifiably procured the breach of the Keeler Employee Agreement by causing and permitting Keeler to perform services on its behalf that violate the Agreement.

61.   With knowledge of the terms of his agreement, Endologix has intentionally and unjustifiably procured the breach of the Rotondo Employee Agreement by causing and permitting Rotondo to perform services on its behalf that violate the Agreement.

62.   Endologix's tortious conduct has caused and will continue to cause Medtronic injury, including without limitation attorneys' fees and other expenses incurred in enforcing the Keeler and Rotondo Employee Agreements against Keeler and Rotondo.

14

63.     By virtue of the foregoing, Medtronic is entitled to recover damages from Endologix, including without limitation its attorneys' fees and other expenses incurred in enforcing the Keeler and Rotondo Employee Agreements against Keeler and Rotondo.

64.     The tortious conduct of Endologix threatens Medtronic with irreparable harm, including the misappropriation of its confidential information and injury to its customer goodwill. By virtue of the foregoing, Medtronic is entitled to injunctive relief, including restraining Endologix from employing Keeler and Rotondo in violation of their Employee Agreements, and requiring disgorgement of all profits earned by virtue of Endologix's tortious interference with the Keeler and Rotondo Employee Agreements.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs Medtronic, Inc., and Medtronic USA, Inc. pray for a judgment in their favor and against Defendants, jointly and severally, as follows:

A.     Enjoining Keeler from violating the Keeler Employee Agreement.

B.     Enjoining Rotondo from violating the Rotondo Employee Agreement.

C.     Enjoining Endologix from permitting Keeler and Rotondo to violate their Employee Agreements on its behalf.

D.     Enjoining Endologix from tortiously interfering with any restrictive covenants in any Employee Agreements Medtronic has with any of its sales personnel in its CardioVascular business unit.

E.     Requiring Defendants to account for and disgorge all income and profits obtained by virtue of their wrongful conduct, and awarding Medtronic a constructive trust over all such income and profits.

F.     Awarding Plaintiffs their damages caused by Defendants' wrongful conduct in an amount greater than $50,000, together with interest, costs, and disbursements to the fullest extent permitted by law.

G.     Awarding Plaintiffs such other, further, or different relief as the Court may deem just and equitable.

Dated: December 14, 2007                    MASLON EDELMAN BORMAN & BRAND, LLP

                                            By_____
                                            William Z. Pentelovitch (#85078)
                                            Mary R. Vasaly (#152523)
                                            Wayne Moskowitz (#17936X)
                                            3300 Wells Fargo Center
                                            90 South Seventh Street
                                            Minneapolis, MN 55402
                                            (612) 672-8200

                                **ATTORNEYS FOR PLAINTIFFS**

                                    **ACKNOWLEDGMENT**

        I, the undersigned, hereby acknowledge that I am familiar with the terms of Minn. Stat.
§ 549.211, and that costs, disbursements and reasonable attorney and witness fees may be
awarded to the opposing party pursuant to Subd. 2 thereof, in the event a party or an attorney acts
in bad faith; asserts a claim or defense that is frivolous and that is costly to another party; asserts
an unfounded position solely to delay the order and course of the proceedings or to harass; or
commits a fraud upon the Court.

                                    _____

560210

**16**

From: 1      Page: 2/17      Date: 12/20/2007 4:19:52 PM

# Exhibit A

 **Medtronic**

Medtronic Vascular
3576 Unocal Place
Santa Rosa, CA 95403
USA

December 15, 2006

Albert M. Rotondo
55 Pine Street
Rockville Centre, NY 11570

Dear Al:

We are very pleased to send you this letter as a formal offer of employment with Medtronic and have you join in our work.

Please note your offer of employment is conditioned on the successful completion and passing of a substance test, a background verification, signing Medtronic's Employee Agreement, and your representation that your employment with Medtronic will not violate any obligations you may owe to any current or previous employers. In addition, you must provide proof of your eligibility to work in the United States.

For your review and consideration, I am enclosing copies of Medtronic's Application, Substance Testing & Abuse Policy and the accompanying Acknowledgement and Consent form, Employee Agreement, and a Release of Information Authorization form.

Upon acceptance of our offer, please complete the enclosed Acknowledgement of Medtronic Substance Testing & Abuse Policy, Release of Information Authorization, and Employment Application and fax them to Margaret Keith at 707-566-1738 along with your signed offer letter within 24 hours.

Listed below are the specific details of our job offer:

START DATE:        January 15, 2007

POSITION:          Sr. Endovascular Sales Representative

TERRITORY:         New York

REPORTING TO:      Randy Delgatti

BASE SALARY:       $3,076.92 bi-weekly ($80,000 annually)
                   Your base salary will be paid bi-weekly, with a one-week lag.

COMMISSION:        You will participate in Medtronic's commission plan and bonus as an Endovascular Sales Representative. Your commission will be guaranteed at $12,000.00 per month for the first six months. If your actual earned commissions exceed this amount, you will be paid the amount you actually earn. Medtronic may at any time terminate or modify, in whole or in part, provisions of its commission plan with or without consent of the Sales Representative. This guarantee is contingent upon you meeting minimum performance expectations as defined by your Regional Sales Manager.

| | |
|---|---|
| **TALENT BONUS PROGRAM:** | We will reinstate your tenure as it relates to the Maximize Your Talent bonus program prior to your May 2006 termination. You will receive Q3 FY2007 Talent Future earnings if you achieve the Long Island territory target for Q3 FY2007. You must be in the territory for a minimum of 4 weeks to qualify. |
| **NEW HIRE BONUS:** | You will receive a new hire bonus in the amount of $25,000.00 all applicable taxes and withholding will apply. The bonus will be paid after 30 days of your start date with Medtronic. In the event you decide to terminate your employment with Medtronic within your first anniversary date, you will agree to pay back to the Company the total amount of the new hire bonus. |
| **ADDITIONAL MENTOR INCENTIVE:** | A quarterly mentor incentive provides you the opportunity to earn additional commission by coaching Sal Spracino. Beginning in Q4FY07 through the end of Q3FY08, you will work with Sal Spracino to achieve the AAA revenue targets in his assigned territory. Below is the calculation and payment plan based on Sal's achievement of AAA AOP: |

- 0% - 99%            1.0% of Sal's AAA revenue
- 100% - 104%      1.5% of Sal's AAA revenue
- 105% and above    2.0% of Sal's AAA revenue

| | |
|---|---|
| **STOCK OPTIONS:** | On your start date, you will be recommended for a stock option grant at the value of $45,000.00. The option will be granted in number of shares based on the market price on the date of the approval of the stock option. |
| **CAR ALLOWANCE:** | $290.77 paid on a bi-weekly basis. Your first car allowance payment will be included on your second paycheck. |
| **SRP – 401(K)** | You will need to reenroll in SRP – Medtronic's 401(K) plan. Your vesting schedule will be reinstated to your original hire date. |
| **RETIREMENT PLAN – PENSION ACCOUNT** | You will be reenrolled in the retirement plan in which you previously participated, as shown in the following table: |

| If You Were Participating in the: | You Will Be Reenrolled in the: |
|---|---|
| Medtronic Retirement Plan (MRP) | Medtronic Retirement Plan (MRP) |
| Personal Pension Account (PPA) | Personal Pension Account (PPA) |
| Personal Investment Account (PIA) | Personal Investment Account (PIA) |

You will not be eligible to change your enrollment in any of the plans shown above.

| | |
|---|---|
| **VACATION:** | You will be entitled to 3 weeks of vacation per year at Medtronic Vascular which is accrued bi-weekly, beginning on your first day of work. |
| **BENEFITS/PAYROLL:** | Benefit information is included with this offer. Should you accept our offer, decisions must be made regarding your health coverage as well as |

From: 1       Page: 5/17       Date: 12/20/2007 4:19:52 PM

other benefits within 30 days of your start date.  Please mail or fax your signed forms to Margaret Keith, HR Assistant, 3576 Unocal Place, Santa Rosa, CA  95403; Tel:  707-591-7354, Fax:  707-566-1738, as soon as possible.

**SUBSTANCE TESTING:** You will have 48 hours from the date of your acceptance to take the necessary substance test.  You need to contact MEDTOX at (651) 636-7466 or (800) 832-3244 to obtain directions to the testing facility and to make arrangements to be tested.  When making our appointment, you will need to cite our group number as 45332.  Please note that if you do not take the test within the allotted time period our offer will be withdrawn.  You must pass this test.  If you do not pass, the Medical Review Officer from Medtox will contact and provide you with the opportunity to explain your test result.  Please note that you may ask the Medical Review Officer for a re-test of the same sample at your own expense. *You will only be contacted if you do not pass the test.*

**RELEASE OF INFORMATION AUTHORIZATION:** A condition of your employment at Medtronic is the successful completion of a background verification.  We will begin this process when we receive the completed Release of Information Authorization from you.

**EMPLOYEE AGREEMENT:** In order to work at Medtronic, you must agree to the terms and sign the Medtronic Employee Agreement.  You are asked to review the agreement and sign the form in the presence of a Medtronic witness on your first day of employment.  A copy is enclosed for your information and records.

**EMPLOYMENT ELIGIBILITY:** Medtronic complies with the federal regulations regarding the completion of the U.S. Department of Justice Immigration and Naturalization Services I-9 Employment Eligibility Form.  Should you accept our offer, the regulations require that you bring original identification documents as outlined on side two of the enclosed Employment Eligibility form.  Again, should you accept, this form will be completed and signed by you in the presence of a Medtronic representative on your first day of employment.  The Medtronic representative will then review your documentation and complete section two of the form.  Failure to produce the required documentation within 72 hours (unless a government authorized extension applies) will result in suspension of employment, without continuation of pay, until these records are provided.

Al, we look forward to your acceptance and contributions.  We would appreciate a response to our office on or before December 8, 2006.  Of course, and as always, please feel free to contact your manager or Alice Hwa, Sr. Principal Human Resources Representative at 707-566-1643 with any questions, comments, or concerns you may have.

Sincerely,

Brennan Marilla
Sr. Director, U.S. Sales – Endovascular Innovations

I accept the terms and conditions of the above offer:

_____          1 - 2 - 2007
Albert M. Rotondo                      Date

cc: Randy Delgatti

Encs:   Application
        Release of Information Authorization
        Substance Testing and Abuse Policy
        Acknowledgment of Medtronic Substance Testing and Abuse Policy
        Employment Agreement

# Exhibit B



# EMPLOYEE AGREEMENT

## INTRODUCTION

Medtronic and the undersigned Employee recognize it is important that Medtronic protect its rights with respect to its confidential business and product information, inventions, and customer relationships without unduly impairing the Employee's ability to pursue his/her profession. Medtronic and the Employee also recognize that Medtronic provides valuable training to Employee, entrusts Employee with confidential information, business and customer relationships and goodwill, and compensates Employee to support, develop, administer, maintain, promote, market and/or sell Medtronic products.

Accordingly, Employee enters into this Agreement in consideration for the following: (i) Medtronic's offer of employment or continuing employment and the benefits associated with that employment; (ii) Medtronic's promise of granting Employee access to confidential information necessary to perform Employee's duties; (iii) Medtronic's actual grant to Employee of access to confidential information necessary to perform the Employee's duties; (iv) Medtronic's promise to provide Employee valuable training, (v) Medtronic's actual provision of training to Employee; (vi) Medtronic's promise to provide Employee access to Medtronic's business and customer relationships and goodwill; (vii) Medtronic's actual provision to Employee of access to Medtronic's business and customer relationships and goodwill; (viii) Medtronic's obligations to the Employee contained in this Agreement; (ix) or other consideration which the Employee acknowledges was received and was sufficient consideration for the promises in this Agreement.

## SECTION 1: DEFINITIONS

**PLEASE NOTE:** Terms that are CAPITALIZED have the following defined meaning whenever used in this Agreement:

1.1  **COMPETITIVE PRODUCT** means goods, products, product lines or services, and each and every component thereof, developed, designed, produced, manufactured, marketed, promoted, sold, supported, serviced, or that are in development or the subject of research by anyone other than MEDTRONIC that are the same or similar, perform any of the same or similar functions, may be substituted for, or are intended or used for any of the same purposes as a MEDTRONIC PRODUCT.

1.2  **COMPETITIVE RESEARCH AND SUPPORT** means any research, development, analysis, planning or support services of any kind or nature, including without limitation theoretical and applied research, or business, technical, regulatory or systems research,

0106

analysis, planning or support, for a CONFLICTING ORGANIZATION that is intended for, or may be useful in, assisting, improving or enhancing any aspect of the development, design, production, manufacture, marketing, promotion, sale, support or service of a COMPETITIVE PRODUCT.

1.3   **CONFIDENTIAL INFORMATION** means any information relating to MEDTRONIC's business, including a formula, pattern, compilation, program, device, method, technique, system, plan, or process, that the Employee learns or develops during the course of Employee's employment by MEDTRONIC that derives independent economic value from not being generally known, or readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use. CONFIDENTIAL INFORMATION includes but is not limited to trade secrets and INVENTIONS and, without limitation, may relate to research; development; experiments; clinical investigations; clinical trials; clinical and product development results and data; engineering; product specifications; computer programs; computer software; hardware configurations; manufacturing processes; compositions; algorithms; know-how; methods; machines; management systems and techniques; strategic plans; long-range plans; operating plans; organizational plans; financial plans; financial models; financial projections; nonpublic financial information; business, financial, planning, and strategic systems and methods; operating systems; information systems; acquisition and divestiture goals, plans, strategies or targets; regulatory strategies, plans and approaches; quality control systems and techniques; patent and intellectual property strategies, plans and approaches; vendor and customer data; employee and personnel data; human resources goals, plans and strategies; human resource management techniques; sales volumes; pricing strategies; sales and marketing plans and strategies; contracts and bids; and any business management techniques that are being planned or developed, utilized or executed by MEDTRONIC.

1.4   **CONFLICTING ORGANIZATION** means any person (including the Employee) or entity, and any parent, subsidiary, partner or affiliate (regardless of their legal form) of any person or entity, that engages in, or is about to become engaged in, the development, design, production, manufacture, promotion, marketing, sale, support or service of a COMPETITIVE PRODUCT or in COMPETITIVE RESEARCH AND SUPPORT.

1.5   **INVENTION(S)** means any and all inventions, discoveries, ideas, processes, writings, works of authorship, designs, developments and improvements, whether or not protectible under the applicable patent, trademark or copyright statutes, generated, conceived or reduced to practice by the Employee, alone or in conjunction with others, while employed by MEDTRONIC.

1.6   **MEDTRONIC** means Medtronic, Inc., a Minnesota corporation with its principal place of business in the State of Minnesota, and all of its parents, subsidiaries or affiliated corporations, and their successors and assigns, that exist or may exist during all or any portion of the time this Agreement is in effect.

1.7   **MEDTRONIC CUSTOMER(S)** means any person, entity or institution, including the employees, agents or representatives who controlled, directed or influenced the purchasing decisions of any such person, entity or institution, to whom or to which Employee

0106                                    2

sold, negotiated the sales, supported, marketed or promoted products or services on behalf of MEDTRONIC during the last one (1) year in which Employee was employed by MEDTRONIC.

**1.8   MEDTRONIC PRODUCT(S)** means any goods, products, or product lines (a) that the services the Employee (or persons under Employee's management, direction or supervision) performed for MEDTRONIC related to, directly or indirectly, during the last one (1) year in which the Employee was employed by MEDTRONIC, including without limitation services in the areas of research, design, development, production, manufacture, marketing, promotion, sales, or business, technical, regulatory or systems research, analysis, planning or support relating to such goods, products, or product lines, or (b) with respect to which Employee at any time received or otherwise obtained or learned CONFIDENTIAL INFORMATION.

## SECTION 2:   EMPLOYMENT

**2.1   Employment At-Will.**   MEDTRONIC agrees to employ or continue to employ Employee at-will. The parties agree that either party may terminate Employee's employment at any time for any reason. This Agreement is ancillary to at-will employment and does not purport to include all of the terms of, or supersede, that relationship.

**2.2   Compensation.**   The compensation, benefits, and other financial terms and conditions applicable to Employee's employment at the inception of this Agreement are set forth in separate documents provided to Employee. Any changes in the compensation and/or benefits of Employee after this Agreement becomes effective shall not terminate or invalidate this Agreement or affect or impair the validity or enforceability of this Agreement.

**2.3   Duties.**   Employee agrees to diligently, loyally and faithfully perform and discharge the duties assigned to Employee from time to time, and all duties associated therewith, to engage in no activities detrimental to MEDTRONIC's interests, to be familiar with MEDTRONIC policies that relate to Employee's duties, and to abide by MEDTRONIC's policies as they exist from time to time, including, without limitation, MEDTRONIC's policies regarding Code of Conduct, Business Conduct Standards, and CONFIDENTIAL INFORMATION. This Agreement continues in force and effect if the Employee's duties, title, or location of work for MEDTRONIC change after this Agreement becomes effective, and any such change shall not terminate or invalidate this Agreement or affect or impair the validity or enforceability of this Agreement.

**2.4   Protection of Former Employer.**   Employee agrees not to divulge to, or use for the benefit of, MEDTRONIC any proprietary, trade secret, or confidential information of a former employer.

0106

3

## SECTION 3:  TRAINING, CONFIDENTIAL INFORMATION AND GOODWILL

**3.1  MEDTRONIC's Promises To Employee.**  MEDTRONIC agrees that: (a) upon commencement of employment it will provide Employee with one or more of the following: appropriate valuable training which may include but not be limited to self-study materials and course work, classroom training, on-the-job training, and other forms of training, MEDTRONIC's valuable business and customer relationships, MEDTRONIC's goodwill, and CONFIDENTIAL INFORMATION; and (b) from time to time throughout the course of Employee's employment, MEDTRONIC will continue to provide training, access to valuable business and customer relationships, goodwill and CONFIDENTIAL INFORMATION to Employee.

**3.2  Goodwill.**  Employee acknowledges that MEDTRONIC owns the goodwill in Employee's relationships with MEDTRONIC CUSTOMERS that Employee maintains or develops in the course and scope of Employee's employment by MEDTRONIC. If Employee owned goodwill in customer relationships when Employee commenced employment with MEDTRONIC, Employee assigns any and all such goodwill to MEDTRONIC, and MEDTRONIC shall become the owner of such goodwill.

**3.3  Employee's Use of Training, Business and Customer Relationships, Goodwill and CONFIDENTIAL INFORMATION.**  MEDTRONIC agrees to provide Employee with valuable training and to entrust Employee with such of MEDTRONIC's valuable business and customer relationships, goodwill and CONFIDENTIAL INFORMATION as is necessary for Employee to discharge Employee's duties. Employee agrees to use such valuable training and to continue to develop such relationships, goodwill and CONFIDENTIAL INFORMATION solely and exclusively for MEDTRONIC's benefit.

**3.4  Fiduciary Duties.**  Employee agrees that Employee shall treat all CONFIDENTIAL INFORMATION, training, business and customer relationships, and goodwill entrusted to Employee by MEDTRONIC as a fiduciary, and Employee accepts and undertakes all of the obligations of a fiduciary, including good faith, trust, confidence and candor, and Employee agrees to use such training and to maintain, protect and develop CONFIDENTIAL INFORMATION, business and customer relationships, and goodwill solely and exclusively for the benefit of MEDTRONIC.

**3.5  MEDTRONIC Property.**  All documents and things provided to Employee by MEDTRONIC for use in connection with Employee's employment, or created by the Employee in the course and scope of Employee's employment by MEDTRONIC, are the property of MEDTRONIC and shall be held by Employee as a fiduciary on behalf of MEDTRONIC. Upon termination of Employee's employment, Employee shall return promptly to MEDTRONIC, without the requirement of a prior demand by MEDTRONIC, all such documents and things, together with all copies, recordings, abstracts, notes, reproductions or electronic versions of any kind made from or about the documents and things or the information they contain.

**3.6  Nondisclosure.**  Employee agrees not to use or disclose any CONFIDENTIAL INFORMATION to or for the benefit of anyone other than MEDTRONIC, either during or after

0106

4

employment, for as long as the information retains the characteristics described in Section 1.3. Employee further agrees and understands that this provision prohibits Employee from rendering services to a CONFLICTING ORGANIZATION for two (2) years following termination of employment with MEDTRONIC to the extent that Employee would use, disclose or rely upon CONFIDENTIAL INFORMATION or be induced or required to use, disclose or rely upon CONFIDENTIAL INFORMATION during the course of rendering such services.

## SECTION 4:  POST-EMPLOYMENT RESTRICTIONS

**4.1      Restrictions on Competition.**   Employee agrees that while employed by MEDTRONIC, and for two (2) years after the last day Employee is employed by MEDTRONIC, Employee will not be employed by or otherwise perform services for a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH AND SUPPORT. If, however, during the last twelve (12) months of employment with MEDTRONIC, Employee had no management duties or responsibilities and was engaged exclusively in sales activities, including selling, soliciting the sale, or supporting the sale of MEDTRONIC PRODUCTS through direct contact with MEDTRONIC CUSTOMERS, this restriction will be for a duration of only one (1) year after the last day Employee is employed by MEDTRONIC, and will prohibit Employee only from soliciting, selling to, contacting, or attempting to divert business from, whether directly or by managing, directing or supervising others, any MEDTRONIC CUSTOMER on behalf of a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH AND SUPPORT.

**4.2      Prohibition on Solicitation of MEDTRONIC Employees.**   Employee agrees that at all times while employed by MEDTRONIC, and for one (1) year thereafter, Employee will not solicit, cause to be solicited, or participate in or promote the solicitation of any person to terminate that person's employment with MEDTRONIC or to breach that person's employment agreement with MEDTRONIC.

**4.3      Post-Employment Disclosure.**   In the event Employee's employment with MEDTRONIC terminates, Employee agrees that during the term of the restrictions described in Section 4.1, Employee will promptly inform MEDTRONIC of the identity of any new employer, the job title of Employee's new position, and a description of any services to be rendered to that employer.  In addition, Employee agrees to respond within ten (10) days to any written request from MEDTRONIC for further information concerning Employee's work activities sufficient to provide MEDTRONIC with assurances that Employee is not violating any of the obligations Employee has undertaken in this Agreement.

**4.4      Ancillary Promises.**   The promises of Employee to MEDTRONIC contained in Sections 3.3, 3.4, 3.5 and 3.6 are reciprocal to the promises of MEDTRONIC to Employee contained in Section 3.1.  MEDTRONIC's promises to Employee contained in Section 3.1 give rise to MEDTRONIC's interest in enforcing Employee's promises in Sections 4.1, 4.2 and 4.3, which promises of Employee to MEDTRONIC are ancillary to the reciprocal promises of

0106

5

MEDTRONIC and Employee contained in Sections 3.1, 3.3, 3.4 3.5 and 3.6 and are intended to enforce Employee's promises to MEDTRONIC contained in Sections 3.3, 3.4, 3.5 and 3.6.

## SECTION 5:  COMPENSATION FOR NON-COMPETITION PERIOD

    **5.1**    **Post-Termination Compensation.**  If Employee is unable to accept a bona fide offer of employment from a new employer solely on account of Section 4.1 and subsequently experiences Economic Hardship as a result thereof, MEDTRONIC will make a Payment to the Employee as provided herein.

    **5.2**    **Definitions.**  In this Section 5, "Payment" means an amount equal to the Employee's Monthly Base Pay minus any Other Compensation the Employee receives or is entitled to receive for each month during which benefits are sought (less applicable state and federal taxes). "Monthly Base Pay" shall be calculated by determining Employee's total salary and commissions (excluding benefits, bonuses, and any indirect or deferred compensation) for the last four (4) full MEDTRONIC fiscal quarters preceding termination of Employee's employment and dividing that amount by twelve. "Other Compensation" means unemployment compensation, severance benefits, and earned income whether received from MEDTRONIC or from any source other than MEDTRONIC. "General Counsel" means the General Counsel of MEDTRONIC or the designee of the General Counsel. "Economic Hardship" results when Other Compensation is less than 75% of Employee's Monthly Base Pay.

    **5.3**    **Term.**  MEDTRONIC's obligation to make the Payments shall terminate upon expiration of the period specified in Section 4.1 or upon MEDTRONIC's written waiver at any time of Employee's obligations under Section 4.1, whichever comes first.

    **5.4**    **Requirement of Bona Fide Offer.**  MEDTRONIC shall be obliged to make an initial Payment provided in Section 5.1 only if (1) Employee provides the General Counsel of MEDTRONIC written confirmation of a bona fide offer of employment within ten (10) days after receipt of the offer by the Employee, and (2) the General Counsel determines that Employee is unable to accept the offer solely because of Section 4.1. Upon making such a determination, the General Counsel shall notify the Employee that the Employee is entitled to an initial Payment, provide the Employee with the address to which Employee shall provide the Reports required by Section 5.5, and direct the appropriate MEDTRONIC personnel to make an initial Payment.

    **5.5**    **Reporting Requirement.**  After the General Counsel determines that Employee is entitled to received an initial Payment, MEDTRONIC will be obliged to make any subsequent Payments only if Employee delivers to the address specified by the General Counsel the following Report by the tenth (10th) day of each month in which the Employee seeks to receive subsequent Payments:

        (a)    A statement describing the details of Employee's good faith efforts during the preceding calendar month to find employment consistent with Employee's education, abilities and experience which would not involve

0106

6

violation of Section 4.1 and describing the reasons, if any, that Employee was unable to find such a position.

(b)   A statement by the Employee that the Employee has not violated any provision described in Section 8.3 of this Agreement.

(c)   A statement of the name, address and telephone number of any person or entity from which the Employee received earned income during the preceding calendar month.

(d)   Written evidence (e.g., check stubs, direct deposit notices) of all Other Compensation received by Employee during the preceding calendar month.

If all required information listed above is timely provided and if MEDTRONIC determines that (1) Employee has made adequate good faith efforts under subparagraph (a) above and (2) the Restrictions on Competition in Section 4.1 have resulted in Economic Hardship to Employee, MEDTRONIC will make a Payment to the Employee.

5.6   **Right to Waive.**   MEDTRONIC shall have no obligation to make any Payments provided in Section 5.1 if (1) within ten (10) days after MEDTRONIC is provided a copy of the bona fide written offer of employment by Employee, MEDTRONIC, in its sole and unreviewable discretion, provides a complete or conditional waiver of its right to enforce Section 4.1 as to the specific position described in the bona fide offer of employment or (2) within ten (10) days of making a Payment under Section 5.4 or Section 5.5, MEDTRONIC, in its sole and unreviewable discretion, waives its right to enforce Section 4.1 for the remaining period of the restriction. Such waivers shall be in writing signed by the General Counsel.

## SECTION 6:  INVENTIONS

6.1   **Disclosure.**   Employee agrees to promptly disclose to MEDTRONIC in writing all INVENTIONS.

6.2   **Ownership, Assignment and Recordkeeping.**   All INVENTIONS shall be the exclusive property of MEDTRONIC. Employee hereby assigns all INVENTIONS to MEDTRONIC. Employee agrees to keep accurate, complete and timely records of Employee's INVENTIONS, which records shall be the property of MEDTRONIC and shall be retained on MEDTRONIC's premises.

6.3   **Cooperation.**   During and after the termination of Employee's employment, Employee agrees to give MEDTRONIC all cooperation and assistance necessary to perfect, protect, and use its rights to INVENTIONS. Without limiting the generality of the foregoing, Employee agrees to sign all documents, do all things, and supply all information that MEDTRONIC may deem necessary to (a) transfer or record the transfer of Employee's entire

From: 1      Page: 15/17      Date: 12/20/2007 4:19:53 PM

right, title and interest in INVENTIONS, and (b) enable MEDTRONIC to obtain patent, copyright or trademark protection for INVENTIONS anywhere in the world.

**6.4    Attorney-in-Fact.** Employee irrevocably designates and appoints MEDTRONIC and its duly authorized officers and agents as attorney-in-fact to act for and in Employee's behalf and stead to execute and file any lawful and necessary documents, and to do all other lawfully permitted acts, required for the assignment of, application for, or prosecution of letters States or foreign application for letters patent, copyright or trademark with the same legal force and effect as if executed by Employee.

**6.5    Waiver.** Employee hereby waives and quitclaims to MEDTRONIC any and all claims, of any nature whatsoever, which Employee may now have or may hereafter have for infringement of any patent, copyright, or trademark resulting from any INVENTION.

**6.6    Future Patents.** Any INVENTION relating to the business of MEDTRONIC with respect to which Employee files a patent application within one (1) year following termination of Employee's employment shall be presumed to cover INVENTIONS conceived by Employee during the term of Employee's employment, subject to proof to the contrary by Employee by good faith, contemporaneous, written and duly corroborated records establishing that such INVENTION was conceived and made following termination of employment and without using CONFIDENTIAL INFORMATION.

**6.7    Release or License.** If an INVENTION does not relate to the existing or reasonably foreseeable business interests of MEDTRONIC, MEDTRONIC may, in its sole and unreviewable discretion, release or license the INVENTION to the Employee upon written request by the Employee. No release or license shall be valid unless in writing signed by MEDTRONIC's Chief Patent Counsel or MEDTRONIC's General Counsel.

**6.8    Notice.** Pursuant to Minnesota Statutes Section 181.78, Employee is hereby notified that this Agreement does not apply to any INVENTION for which no equipment, supplies, facility or trade secret information of MEDTRONIC was used and which was developed entirely on the Employee's own time, and (1) which does not relate (a) directly to the business of MEDTRONIC or (b) to MEDTRONIC's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the Employee for MEDTRONIC.

## SECTION 7:  GOVERNING LAW, VENUE AND JURISDICTION

**7.1    Place of Agreement.** Because Medtronic, Inc. is a Minnesota corporation with its principal place of business located in Minnesota, and because it is mutually agreed that it is in the best interests of MEDTRONIC and all of its employees that a uniform body of law consistently interpreted be applied to the employment agreements between MEDTRONIC and all of its employees, this Agreement is deemed entered into in the State of Minnesota between MEDTRONIC and Employee, and the substantive laws of Minnesota and the exclusive

jurisdiction of the courts of Minnesota shall be applicable hereto on the terms and conditions specified below.

7.2     **Governing Law.**   The validity, enforceability, construction and interpretation of this Agreement shall be governed by the laws of the State of Minnesota. Employee irrevocably waives Employee's right, if any, to have the laws of any state other than the State of Minnesota apply to this Agreement.

7.3     **Venue and Personal Jurisdiction.**   Any dispute arising out of or related to this Agreement, or any breach or alleged breach hereof, shall be exclusively decided by a state court in the State of Minnesota. Employee irrevocably waives Employee's right, if any, to have any disputes between Employee and MEDTRONIC arising out of or related to this Agreement decided in any jurisdiction or venue other than a state court in the State of Minnesota. Employee hereby irrevocably consents to the personal jurisdiction of the state courts in the State of Minnesota for the purposes of any action arising out of or related to this Agreement.

7.4     **Covenant Not to Sue.**   Employee irrevocably covenants not to sue MEDTRONIC in any jurisdiction other than a state court in the State of Minnesota for the purposes of any action arising out of or related to this Agreement. Employee further agrees not to assist, aid, abet, encourage, be a party to, or participate in the commencement or prosecution of any lawsuit or action by any third party arising out of or related to this Agreement in any jurisdiction or venue other than a state court in the State of Minnesota; provided, however, that nothing herein shall prohibit or restrict Employee from being a witness or otherwise providing evidence in any action pursuant to court order or subpoena.

## SECTION 8:   OTHER PROVISIONS

8.1     **Obligations Unconditional.**   The obligation of the parties to perform the terms of this Agreement is unconditional and does not depend on the performance or nonperformance of any terms, duties, or obligations not specifically recited in this Agreement. Employee irrevocably waives Employee's right to challenge the enforceability or validity of any portion of this Agreement.

8.2     **Waiver.**   No waiver by MEDTRONIC of any breach of this Agreement by Employee shall be valid unless contained in a writing signed by the General Counsel of MEDTRONIC or the General Counsel's designee. Waiver of any breach of this Agreement shall not constitute, or be deemed, a waiver of any other breach of this Agreement.

8.3     **Provisions Survive Termination.**   To the extent that any provisions of this Agreement apply to the time period after, or require performance or enforcement after, termination of Employee's employment, all such provisions survive the termination of Employee's employment and termination of this Agreement and may be enforced subsequent thereto. Without limiting the generality of the foregoing, Section 1, Sections 3.2, 3.3, 3.4, 3.5 and 3.6, Section 4, Section 5, Section 6 and Section 7 each survive termination of Employee's employment and termination of this Agreement.

0106

8.4   **Prior Agreements.**   Except to the extent provided in Section 8.5, all prior agreements, if any, between MEDTRONIC and Employee relating to any part of the subject matter of this Agreement are superseded and rendered null and void upon execution of this Agreement by Employee; provided, however, that nothing in this Agreement invalidates, renders null or void, or otherwise affects any term or provision of any MEDTRONIC compensation or benefit plan or any agreements related thereto.

8.5   **Validity Not Impaired.**   In the event that any provision of this Agreement is unenforceable under applicable law, the validity or enforceability of the remaining provisions shall not be affected. To the extent any provision of this Agreement is judicially determined to be unenforceable, any provisions of any prior agreement between Employee and MEDTRONIC addressing the subject matter of the unenforceable provision shall be deemed to govern the relationship between Employee and MEDTRONIC.

8.6   **Transfer or Assignment.**   MEDTRONIC may transfer or assign its rights and obligations pursuant to this Agreement to its successors or assigns.

8.7   **Tolling.**   In the event Employee breaches or violates Sections 4.1, 4.2 or 4.3 hereinabove, the duration of the restrictions contained therein shall be extended by the number of days the Employee remains in breach or violation thereof. This provision may be specifically enforced.

This Agreement becomes binding and effective on MEDTRONIC and Employee upon signature by Employee.

Date: 12/29/06

ALBERT ROTONDO
Employee Name (please print)

Employee Signature

0106                                          10

From: 1      Page: 1/24      Date: 12/20/2007 4:33:59 PM

# F   A   X

**TO:**      **Paul McCormick**          **DATE:**  Dec 20, 2007

**FROM:**    Al Rotondo

**RE:**

**Thank you,**

**Have a great weekend.**

**Al**

# Exhibit C



**Medtronic**

Medtronic Vascular
3576 Unocal Place
Santa Rosa, CA 95403 USA
www.medtronic.com

December 30, 2003

Brooke L. Adams
261 Bunker Hill Street
Charlestown, MA 02129

Dear Brooke:

We are very pleased to send you this letter as a formal offer of employment with Medtronic. Medtronic is the world's leading medical technology company providing lifelong solutions for people with chronic disease. We are eager to have you join in our work.

Please note your offer of employment is conditioned on the successful completion and passing of a substance test, a background verification, and your signing Medtronic's Employee Agreement. You also must provide proof of your eligibility to work in the United States.

For your review and consideration, I am enclosing copies of Medtronic's Application, Substance Testing & Abuse Policy and the accompanying Acknowledgement and Consent form, Employee Agreement, and a Release of Information Authorization form.

<u>**Upon acceptance of our offer, please complete the enclosed Acknowledgement of Medtronic Substance Testing & Abuse Policy and Release of Information Authorization and fax them to Anya Paull at 707-566-1783 along with your signed offer letter within 24 hours.**</u>

Listed below are the specific details of our job offer:

START DATE:          February 2, 2004

POSITION:            Endovascular Sales Representative

TERRITORY:           Boston, MA

REPORTING TO:        Michael McDermott

BASE SALARY:         $2,307.69 bi-weekly ($60,000 annually)
                     Your base salary will be paid bi-weekly, with a one-week lag.

COMMISSION:          You will participate in Medtronic's commission plan and bonus for Medtronic's Endovascular Sales Representative. Your commission will be guaranteed at $10,000.00 per month for the first 3 months of your employment. If your actual earned commissions exceed this amount, you will be paid the amount you actually earn. Medtronic may at any time terminate or modify, in whole or in part, provisions of its commission plan with or without consent of the Sales Representative. This guarantee is contingent upon your meeting minimum performance expectations as defined by your Manager.

*When Life Depends on Medical Technology*

From: 1     Page: 4/24     Date: 12/20/2007 4:33:59 PM

**CAR ALLOWANCE:** $290.77 paid on a bi-weekly basis. Your first car allowance payment will be included on your second paycheck.

**SUBSTANCE TESTING:** <u>You will have 48 hours from the date of your acceptance to take the necessary substance test. You need to contact MEDTOX at (651) 636-7466 or (800) 832-3244 to obtain directions to the testing facility and to make arrangements to be tested.</u> When making our appointment, you will need to cite our <u>group number</u> as <u>45332</u>. Please note that if you do not take the test within the allotted time period our offer will be withdrawn. You must pass this test. If you do not pass, our Medical Review Officer will contact you and provide you with the opportunity to explain a positive test result. Please note that you may ask the Medical Review Officer for a re-test of the same sample at your own expense. *You will only be contacted if you do not pass the test.*

**RELEASE OF INFORMATION AUTHORIZATION:** A condition of your employment at Medtronic is the successful completion of background verification. We will begin this process when we receive the completed Release of Information Authorization from you.

**EMPLOYEE AGREEMENT:** In order to work at Medtronic, you must agree to the terms and sign the Medtronic Employee Agreement. You are asked to review the agreement and sign the form in the presence of a Medtronic witness on your first day of employment. A copy is enclosed for your information and records.

**EMPLOYMENT ELIGIBILITY:** Medtronic complies with the federal regulations regarding the completion of the U.S. Department of Justice Immigration and Naturalization Services I-9 Employment Eligibility Form. Should you accept our offer, the regulations require that you bring original identification documents as outlined on side two of the enclosed Employment Eligibility form.

Again, should you accept, this form will be completed and signed by you in the presence of a Medtronic representative on your first day of employment. The Medtronic representative will then review your documentation and complete section two of the form. Failure to produce the required documentation within 72 hours (unless a government authorized extension applies) will result in suspension of employment, without continuation of pay, until these records are provided.

**BENEFITS/PAYROLL:** Benefit information will follow your acceptance of this offer. Decisions must be made regarding your health coverage as well as other benefits within 30 days. Signed forms need to be returned to Anya Paull, Human Resources Technician, 3576 Unocal Place, Santa Rosa, CA 95403, at your earliest convenience. <u>In addition, forms to put you on our payroll need to be completed. Please complete them as soon as possible and return them to attention Anya Meyskens.</u>

Brooke, we look forward to your acceptance and to your contributions.  We would appreciate a response to our office on or before January 6th, 2004.  Of course, and as always, please feel free to contact your manager or Anne-Marie Hodkinson, Director of Human Resources at 707-591-7360 with any questions, comments, or concerns you may have.

Sincerely,

Matt Borenzweig
Vice President, U.S. Sales – Endovascular Innovations


I accept the terms and conditions of the above offer:

_____          1/5/2004
Brooke L. Adams                                       Date


cc:     Matt Borenzweig
        Michael McDermott

Encs:   Application
        Release of Authorization Information
        Substance Testing and Abuse Policy
        Acknowledgment of Medtronic Substance Testing and Abuse Policy

From: 1      Page: 6/24      Date: 12/20/2007 4:33:59 PM

# Exhibit D

COPY

# MEDTRONIC EMPLOYEE AGREEMENT

## INTRODUCTION

Medtronic and the undersigned Employee recognize it is important that Medtronic protect its rights with respect to its confidential business and product information, inventions, and customer relationships without unduly impairing the Employee's ability to pursue his/her profession. Medtronic and the Employee also recognize that Medtronic provides valuable training to Employee, entrusts Employee with confidential information, business relationships, and goodwill and compensates Employee to support, develop, administer, maintain, and/or sell Medtronic products.

Accordingly, Employee enters into this Agreement in consideration for the following: (i) Medtronic's offer of employment or continuing employment and the benefits associated with that employment; (ii) Medtronic's promise of granting Employee access to confidential information necessary to perform Employee's duties; (iii) Medtronic's actual grant to Employee of access to confidential information necessary to perform the Employee's duties; (iv) Medtronic's promise to provide Employee valuable training, (v) Medtronic's actual provision of training to Employee; (vi) Medtronic's promise to provide Employee access to Medtronic's business and customer relationships and goodwill; (vii) Medtronic's actual provision to Employee of access to Medtronic's business and customer relationships and goodwill; (viii) Medtronic's obligations to the Employee contained in this Agreement; (ix) or other consideration, all of which the Employee acknowledges was received and was sufficient consideration for the promises in this Agreement.

## SECTION 1:  DEFINITIONS

The terms defined below have the defined meaning whenever used in this Agreement:

**1.1     COMPETITIVE PRODUCT** means goods, products, product lines or services, and each and every component thereof, developed, designed, manufactured, marketed, promoted, sold, serviced, or that are in development or the subject of research by anyone other than MEDTRONIC that are the same or similar, perform any of the same or similar functions, may be substituted for, or are intended or used for any of the same purposes as a MEDTRONIC PRODUCT.

**1.2     COMPETITIVE RESEARCH** means any research or development of any kind or nature conducted by anyone other than MEDTRONIC, including without limitation theoretical and applied research, which is intended for, or may be useful in, any aspect of the development, design, production, manufacture, marketing, promotion, sale, or service of a COMPETITIVE PRODUCT.

**1.3     CONFIDENTIAL INFORMATION** means any information relating to MEDTRONIC's business, including a formula, pattern, compilation, program, device, method, technique, or process, that the Employee learns or develops during the course of Employee's

employment by MEDTRONIC that derives independent economic value from not being generally known, or readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use. CONFIDENTIAL INFORMATION includes but is not limited to trade secrets and INVENTIONS and, without limitation, may relate to research, development, experiments, clinical investigations, clinical trials, engineering, product specifications, computer programs, computer software, hardware configurations, manufacturing processes, compositions, algorithms, know-how, methods, machines, management systems, strategic plans, business methods, nonpublic financial information, proprietary and confidential information pertaining to vendors and customers, employee and personnel data, sales volumes, pricing strategies, sales and marketing plans and strategies, contracts and bids.

1.4   **CONFLICTING ORGANIZATION** means any person (including the Employee) or entity, and any parent, subsidiary, partner, or affiliate (regardless of their legal form) of any person or entity, that engages in, or is about to become engaged in, the development, design, production, manufacture, promotion, marketing, sale, support, or service of a COMPETITIVE PRODUCT or in COMPETITIVE RESEARCH.

1.5   **INVENTION(S)** means any and all inventions, discoveries, ideas, processes, writings, works of authorship, designs, developments and improvements, whether or not protectible under the applicable patent, trademark, or copyright statutes, generated, conceived, or reduced to practice by the Employee, alone or in conjunction with others, while employed by MEDTRONIC.

1.6   **MEDTRONIC** means Medtronic, Inc., a Minnesota corporation with its principal place of business in the State of Minnesota, and all of its parents, subsidiaries or affiliated corporations, and their successors and assigns, that exist or may exist during all or any portion of the time this Agreement is in effect.

1.7   **MEDTRONIC CUSTOMER(S)** means any person, entity or institution to whom or to which Employee, or persons under Employee's management, direction or supervision, sold, solicited sales, supported, marketed or promoted products or services on behalf of MEDTRONIC during the last one (1) year in which Employee was employed by MEDTRONIC. Without limiting the generality of the foregoing, the term MEDTRONIC CUSTOMER includes all employees, agents or representatives, and any other persons who control, direct or influence purchasing decisions of any such person, entity or institution.

1.8   **MEDTRONIC PRODUCT(S)** means any goods, products, product lines or services (a) that during the last one (1) year in which the Employee was employed by MEDTRONIC, Employee, or persons under Employee's management, direction or supervision, performed research regarding, designed, developed, marketed, promoted, sold, solicited sales of, supported, serviced, or provided on behalf of MEDTRONIC, or (b) with respect to which Employee at any time received or otherwise obtained or learned CONFIDENTIAL INFORMATION.

## SECTION 2:  EMPLOYMENT

2

2.1   **Employment At-Will.**   MEDTRONIC agrees to employ or continue to employ Employee at-will.  The parties agree that either party may terminate Employee's employment at any time for any reason.  This Agreement is ancillary to at-will employment and does not purport to include all of the terms of, or supersede, that relationship.

2.2   **Compensation.**   The compensation, benefits, and other financial terms and conditions applicable to Employee's employment at the inception of this Agreement are set forth in separate documents provided to Employee.  Any changes in the compensation and benefits of Employee after this Agreement becomes effective shall not terminate or invalidate this Agreement or affect or impair the validity or enforceability of this Agreement.

2.3   **Duties.**   Employee agrees to diligently, loyally and faithfully perform and discharge the duties assigned to Employee from time to time, and all duties associated therewith, to engage in no activities detrimental to MEDTRONIC's interests, to be familiar with MEDTRONIC policies that relate to Employee's duties, and to abide by MEDTRONIC's policies as they exist from time to time, including, without limitation, MEDTRONIC's policies regarding Code of Conduct, Business Conduct Standards, and CONFIDENTIAL INFORMATION. This Agreement continues in force and effect if the Employee's duties, title, or location of work for MEDTRONIC change after this Agreement becomes effective, and any such change shall not terminate or invalidate this Agreement or affect or impair the validity or enforceability of this Agreement.

2.4   **Protection of Former Employer.**   Employee agrees not to divulge to, or use for the benefit of, MEDTRONIC any proprietary, trade secret, or confidential information of a former employer.

## SECTION 3: TRAINING, CONFIDENTIAL INFORMATION, AND GOODWILL

3.1   **MEDTRONIC's Promises To Employee.**   MEDTRONIC agrees that: (a) upon commencement of employment it will provide Employee with one or more of the following: appropriate valuable training which may include but not be limited to self-study materials and course work, classroom training, on-the-job training, and other forms of training; MEDTRONIC's valuable business and customer relationships; MEDTRONIC's goodwill; and CONFIDENTIAL INFORMATION; (b) from time to time throughout the course of Employee's employment, it will continue to provide training, access to valuable business and customer relationships, goodwill and CONFIDENTIAL INFORMATION to Employee.

3.2   **Goodwill.**   Employee acknowledges that MEDTRONIC owns the goodwill in Employee's relationships with MEDTRONIC CUSTOMERS that Employee maintains or develops in the course and scope of Employee's employment by MEDTRONIC.  If Employee owned goodwill in customer relationships when Employee commenced employment with MEDTRONIC, Employee assigns any and all such goodwill to MEDTRONIC, and MEDTRONIC shall become the owner of such goodwill.

3

**3.3     Employee's Use of Training, Business and Customer Relationships, Goodwill and CONFIDENTIAL INFORMATION.**   Employee agrees that in consideration of the promises made by MEDTRONIC to Employee to provide Employee valuable training, business and customer relationships, goodwill and CONFIDENTIAL INFORMATION, Employee shall use such valuable training, business and customer relationships, goodwill and CONFIDENTIAL INFORMATION only during the course of Employee's employment by MEDTRONIC and solely and exclusively for the benefit of MEDTRONIC.

**3.4     Fiduciary Duties.**     Employee agrees that Employee shall treat all CONFIDENTIAL INFORMATION, training, business relationships, and goodwill entrusted to Employee by MEDTRONIC as a fiduciary, and Employee accepts and undertakes all of the obligations of a fiduciary, including good faith, trust, confidence and candor, and Employee agrees to use such training and to maintain, protect, and develop CONFIDENTIAL INFORMATION, business relationships, and goodwill solely and exclusively for the benefit of MEDTRONIC.

**3.5     MEDTRONIC Property.**   All documents and things provided to Employee by MEDTRONIC for use in connection with Employee's employment, or created by the Employee in the course and scope of Employee's employment by MEDTRONIC, are the property of MEDTRONIC and shall be held by Employee as a fiduciary on behalf of MEDTRONIC. Upon termination of Employee's employment, Employee shall promptly, and without the requirement of a prior demand by MEDTRONIC, return to MEDTRONIC all such documents and things together with all copies, recordings, abstracts, notes, reproductions, or electronic versions of any kind made from or about the documents and things or the information they contain.

**3.6     Nondisclosure.**     Employee agrees not to use or disclose any CONFIDENTIAL INFORMATION to or for the benefit of anyone other than MEDTRONIC, either during or after employment, for as long as the information retains the characteristics described in Section 1.3. Employee agrees and understands that this provision prohibits Employee from rendering services to a CONFLICTING ORGANIZATION for two years following termination of employment with MEDTRONIC to the extent that Employee would use, disclose or rely upon CONFIDENTIAL INFORMATION or be induced or required to use, disclose or rely upon CONFIDENTIAL INFORMATION during the course of rendering such services.

## SECTION 4:  POST-EMPLOYMENT RESTRICTIONS

**4.1     Restrictions on Competition.**     Employee agrees that while employed by MEDTRONIC, and for two (2) years after the last day Employee is employed by MEDTRONIC, Employee will not be employed or affiliated in any capacity by, become an independent contractor or consultant for, or perform any services for a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH. If, however, during the last twelve (12) months of employment with MEDTRONIC, Employee had no management duties or responsibilities and was engaged exclusively in sales activities, including selling, soliciting the sale, or supporting the sale of MEDTRONIC PRODUCTS through direct contact with MEDTRONIC CUSTOMERS, Employee's post-employment

restriction will be for a duration of one (1) year after the last day Employee is employed by MEDTRONIC, and will prohibit Employee only from soliciting, communicating with or contacting, and from managing, directing or supervising others who solicit, communicate with or contact, any MEDTRONIC CUSTOMER on behalf of a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH.

4.2     **Prohibition on Solicitation of MEDTRONIC Employees.**  Employee agrees that at all times while employed by MEDTRONIC, and for one (1) year thereafter, Employee will not solicit, cause to be solicited, or participate in or promote the solicitation of any person to terminate that person's employment with MEDTRONIC or to breach that person's Employment Agreement with MEDTRONIC.

4.3     **Post-Employment Disclosure.**  Employee agrees that in the event Employee's employment with MEDTRONIC terminates, that during the term of the restrictions described on Section 4.1, Employee will promptly inform MEDTRONIC of the identity of any new employer, the job title of Employee's new position, and a description of any services to be rendered to that employer. In addition, Employee agrees to respond within ten (10) days to any written request from MEDTRONIC for further information concerning Employee's work activities sufficient to provide MEDTRONIC with assurances that Employee is not violating any of the obligations Employee has undertaken in this Agreement.

4.4     **Ancillary Promises.**  The promises of Employee to MEDTRONIC contained in Sections 3.3, 3.4, 3.5 and 3.6 are reciprocal to the promises of MEDTRONIC to Employee contained in Section 3.1. MEDTRONIC's promises to Employee contained in Section 3.1 give rise to MEDTRONIC's interest in enforcing Employee's promises in Sections 4.1, 4.2 and 4.3, which promises of Employee to MEDTRONIC are ancillary to the reciprocal promises of MEDTRONIC and Employee contained in Sections 3.1, 3.3, 3.4 3.5 and 3.6.and are intended to enforce Employee's promises to MEDTRONIC contained in Sections 3.3, 3.4, 3.5 and 3.6.

## SECTION 5:   COMPENSATION FOR NON-COMPETITION PERIOD

5.1     **Post-Termination Compensation.**  If Employee is unable to accept a bona fide offer of employment from a new employer solely because of Section 4.1, MEDTRONIC will make a Payment to the Employee as provided herein.

5.2     **Definitions.**  In this Section 5,"Payment" means an amount equal to the Employee's Monthly Base Pay minus any Other Compensation the Employee receives or is entitled to receive for each month during which benefits are sought (less applicable state and federal taxes). "Monthly Base Pay" shall be calculated by determining Employee's total salary and commissions (excluding benefits, bonuses, and any indirect or deferred compensation) for the last four (4) full MEDTRONIC fiscal quarters preceding termination of Employee's employment and dividing that amount by twelve. "Other Compensation" means unemployment compensation, severance benefits, and earned income whether received from MEDTRONIC or

5

From: 1    Page: 12/24    Date: 12/20/2007 4:34:00 PM

from any source other than MEDTRONIC. "General Counsel" means the General Counsel of MEDTRONIC or the designee of the General Counsel.

5.3     **Term.**  MEDTRONIC's obligation to make the Payments shall terminate upon expiration of the period specified in Section 4.1.

5.4     **Requirement of Bona Fide Offer.**  MEDTRONIC shall be obliged to make an initial Payment provided in Section 5.1 only if (1) Employee provides the General Counsel of MEDTRONIC written confirmation of a bona fide offer of employment within ten (10) days after receipt of the offer by the Employee, and (2) the General Counsel determines that Employee is unable to accept the offer solely because of Section 4.1.  Upon making such a determination, the General Counsel shall notify the Employee that the Employee is entitled to an initial Payment, provide the Employee with the address to which Employee shall provide the Reports required by Section 5.5, and direct the appropriate MEDTRONIC personnel to make an initial Payment.

5.5     **Reporting Requirement.**  After the General Counsel determines that Employee is entitled to received an initial Payment, MEDTRONIC will be obliged to make any subsequent Payments only if Employee delivers to the address specified by the General Counsel the following Report by the tenth (10th) day of each month in which the Employee seeks to receive subsequent Payments:

(a)     A statement describing the details of Employee's good faith efforts during the preceding calendar month to find employment consistent with Employee's education, abilities and experience which would not involve violation of Section 4.1.

(b)     A statement by the Employee that the Employee has not violated any provision described in Section 7.8 of this Agreement.

(c)     A statement of the name, address and telephone number of any person or entity from which the Employee received earned income during the preceding calendar month.

(d)     Written evidence (e.g., check stubs, direct deposit notices) of all Other Compensation received by Employee during the preceding calendar month.

Upon the timely receipt of all required information listed above, MEDTRONIC will make a Payment to the Employee.

6

5.6    **Right to Waive.**  MEDTRONIC shall have no obligation to make any Payments provided in Section 5.1 if, within ten (10) days after MEDTRONIC is provided a copy of the bona fide written offer of employment by Employee, MEDTRONIC, in its sole and unreviewable discretion, waives its right to enforce Section 4.1 as to the specific position described in the bona fide offer of employment. Such waiver shall be in writing signed by the General Counsel.

## SECTION 6: INVENTIONS

6.1    **Disclosure.**  Employee agrees to promptly disclose to MEDTRONIC in writing all INVENTIONS.

6.2    **Ownership, Assignment and Recordkeeping.**  All INVENTIONS shall be the exclusive property of MEDTRONIC.  Employee hereby assigns all INVENTIONS to MEDTRONIC. Employee agrees to keep accurate, complete and timely records of Employee's INVENTIONS, which records shall be the property of MEDTRONIC and shall be retained on MEDTRONIC's premises.

6.3    **Cooperation.**  During and after the termination of Employee's employment, Employee agrees to give MEDTRONIC all cooperation and assistance necessary to perfect, protect, and use its rights to INVENTIONS. Without limiting the generality of the foregoing, Employee agrees to sign all documents, do all things, and supply all information that MEDTRONIC may deem necessary to (a) transfer or record the transfer of Employee's entire right, title and interest in INVENTIONS, and (b) enable MEDTRONIC to obtain patent, copyright, or trademark protection for INVENTIONS anywhere in the world.

6.4    **Attorney-in-Fact.**  Employee irrevocably designates and appoints MEDTRONIC and its duly authorized officers and agents as attorney-in-fact to act for and in Employee's behalf and stead to execute and file any lawful and necessary documents required, and to do all other lawfully permitted acts required, for the assignment of, application for, or prosecution of any United States or foreign application for letters patent, copyright or trademark with the same legal force and effect as if executed by Employee.

6.5    **Waiver.**  Employee hereby waives and quitclaims to MEDTRONIC any and all claims, of any nature whatsoever, which Employee may now have or may hereafter have for infringement of any patent, copyright, or trademark resulting from any INVENTION.

6.6    **Future Patents.**  Any INVENTION relating to the business of MEDTRONIC with respect to which Employee files a patent application within one (1) year following termination of Employee's employment shall be presumed to cover INVENTIONS conceived by Employee during the term of Employee's employment, subject to proof to the contrary by Employee by good faith, contemporaneous, written and duly corroborated records establishing that such INVENTION was conceived and made following termination of employment and without using CONFIDENTIAL INFORMATION.

7

6.7    **Release or License.**    If an INVENTION does not relate to the existing or reasonably foreseeable business interests of MEDTRONIC, MEDTRONIC may, in its sole and unreviewable discretion, release or license the INVENTION to the Employee upon written request by the Employee. No release or license shall be valid unless in writing signed by MEDTRONIC's Chief Patent Counsel or MEDTRONIC's General Counsel.

6.8    **Notice.**    Pursuant to Minnesota Statutes Section 181.78, Employee is hereby notified that this Agreement does not apply to any INVENTION for which no equipment, supplies, facility or trade secret information of MEDTRONIC was used and which was developed entirely on the Employee's own time, and (1) which does not relate (a) directly to the business of MEDTRONIC or (b) to MEDTRONIC's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the Employee for MEDTRONIC.

## SECTION 7:   GOVERNING LAW, VENUE AND JURISDICTION

7.1    **Place of Agreement.**    Because MEDTRONIC, Inc. is a Minnesota corporation with its principal place of business located in Minnesota, and because it is mutually agreed that it is in the best interests of MEDTRONIC and all of its employees that a uniform body of law consistently interpreted be applied to the employment agreements between MEDTRONIC and all of its employees, this Agreement is deemed entered into in the State of Minnesota between MEDTRONIC and Employee, and the substantive laws of Minnesota and the exclusive jurisdiction of the courts of Minnesota shall be applicable hereto on the terms and conditions specified below.

7.2    **Governing Law.**    The validity, enforceability, construction, and interpretation of this Agreement shall be governed by the laws of the State of Minnesota. Employee irrevocably waives Employee's right, if any, to have the laws of any state other than the State of Minnesota apply to this Agreement.

7.3    **Venue and Personal Jurisdiction.**    Any dispute arising out of or related to this Agreement, or any breach or alleged breach hereof, shall be exclusively decided by a state court in the State of Minnesota. Employee irrevocably waives Employee's right, if any, to have any disputes between Employee and MEDTRONIC arising out of or related to Employee's employment or this Agreement decided in any jurisdiction or venue other than a state court in the State of Minnesota. Employee hereby irrevocably consents to the personal jurisdiction of the state courts in the State of Minnesota for the purposes of any action arising out of or related to Employee's employment or this Agreement.

7.4    **Covenant Not to Sue.**    Employee irrevocably covenants not to sue MEDTRONIC in any jurisdiction other than a state court in the State of Minnesota for the purposes of any action arising out of or related to this Agreement. Employee further agrees not to assist, aid, abet, encourage, be a party to, or participate in the commencement or prosecution of any lawsuit or action by any third party arising out of or related to this Agreement in any

8

jurisdiction or venue other than a state court in the State of Minnesota; provided, however, that nothing herein shall prohibit or restrict Employee from being a witness or otherwise providing evidence in any action pursuant to court order or subpoena.

## SECTION 8:  OTHER PROVISIONS

**8.1    Obligations Unconditional.**  The obligation of the parties to perform the terms of this Agreement is unconditional and does not depend on the performance or nonperformance of any terms, duties, or obligations not specifically recited in this Agreement. Employee irrevocably waives Employee's right to challenge the enforceability or validity of any portion of this Agreement.

**8.2    Waiver.**  No waiver by MEDTRONIC of any breach of this Agreement by Employee shall be valid unless contained in a writing signed by the General Counsel of MEDTRONIC or the General Counsel's designee.  Waiver of any breach of this Agreement shall not constitute, or be deemed, a waiver of any other breach of this Agreement.

**8.3    Provisions Survive Termination.**    To the extent that any provisions of this Agreement apply to the time period after, or require performance or enforcement after, termination of Employee's employment, all such provisions survive the termination of Employee's employment and termination of this Agreement and may be enforced subsequent thereto. Without limiting the generality of the foregoing, Section 1, Sections 3.2, 3.3, 3.4, and 3.5, Section 4, Section 5, Section 6 and Section 7 each survive termination of Employee's employment and termination of this Agreement.

**8.4    Prior Agreements.**    Except to the extent provided in Section 8.5, all prior agreements, if any, between MEDTRONIC and Employee relating to any part of the subject matter of this Agreement are superseded and rendered null and void upon execution of this Agreement by Employee and MEDTRONIC; provided, however, that nothing in this Agreement invalidates, renders null or void, or otherwise affects any term or provision of any MEDTRONIC compensation or benefit plan or any agreements related thereto.

**8.5    Validity Not Impaired.**    In the event that any provision of this Agreement is unenforceable under applicable law, the validity or enforceability of the remaining provisions shall not be affected.  To the extent any provision of this Agreement is judicially determined to be unenforceable, any provisions of any prior agreement between Employee and MEDTRONIC addressing the subject matter of the unenforceable provision shall be deemed to govern the relationship between Employee and MEDTRONIC.

**8.6    Transfer or Assignment.**    MEDTRONIC may transfer or assign its rights and obligations pursuant to this Agreement to its successors or assigns.

**8.7    Tolling.**    In the event Employee breaches or violates Sections 4.1, 4.2 or 4.3 hereinabove, the duration of the restrictions contained therein shall be extended by the number of

9

days the Employee remains in breach or violation thereof.  This provision may be specifically enforced.

This Agreement becomes binding and effective on MEDTRONIC and Employee upon signature by Employee.

Date: __1/5/2004__

*Brooke L. Adams*
Employee Name (please print)

Employee Signature

10

# Exhibit E

From: 1     Page: 18/24     Date: 12/20/2007 4:34:00 PM

*FY08 Vascular (Endologix/Keeler)*


**Medtronic**

Medtronic Vascular
Endovascular Innovations
3576 Unocal Place
Santa Rosa, CA 95403
www.medtronic.com

707.525.0111

September 17, 2007

**RECEIVED**

SEP 25 2007

LAW DEPARTMENT
MEDTRONIC, INC.

Ms. Brooke Keeler
222 Pleasant Street
Marshfield, MA 02050

Re: Post-Employment Restrictions

Dear Ms. Keeler:

You recently left employment with Medtronic, Inc., and we understand that you are now providing services to Endologix, a competitor of Medtronic. This letter serves to remind you of the post-employment obligations you have to Medtronic, Inc. under the Medtronic Employee Agreement ("Agreement"), which you signed on January 5, 2004. A copy of that Agreement is enclosed for your review.

You agreed in paragraph 4.1 of that Agreement since you had no management duties or responsibilities during the last twelve (12) months of employment with MEDTRONIC, and since you were engaged exclusively in sales activities, including selling, soliciting the sale, or supporting the sale of MEDTRONIC PRODUCTS through direct contact with MEDTRONIC CUSTOMERS, you would be restricted for a duration of one (1) year after the last day you were employed by Medtronic. This restriction prohibits you from soliciting, communicating with or contacting, and from managing, directing or supervising others who solicit, communicate with or contact, any MEDTRONIC CUSTOMER on behalf of a CONFLICTING ORGANIZTION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH.
CONFLICTING ORGANIZATION is defined in Paragraph 1.4 as:

any person (including the Employee) or entity, and any parent, subsidiary, partner or affiliate (regardless of their legal form) of any person or entity, that engages in, or is about to become engaged in, the development, design, production, manufacture, promotion, marketing, sale, support or service of a COMPETITIVE PRODUCT or in COMPETITIVE RESEARCH.

MEDTRONIC CUSTOMER is defined in Paragraph 1.7 as:

any person, entity or institution to whom or to which Employee, or persons under Employee's management, direction or supervision, sold, solicited sales, supported, marketed or promoted products or services on behalf of MEDTRONIC during the last one (1) year in which Employee was employed by MEDTRONIC. Without limiting the generality of the foregoing, the term MEDTRONIC CUSTOMER includes all employees, agents or representatives, and any other persons who control, direct or influence purchasing decisions of any such person, entity or institution.

As such, you are restricted from the following accounts for the purpose of selling or promoting abdominal aortic aneurysm and peripheral products:

*Alleviating Pain · Restoring Health · Extending Life*

Ms. Brooke Keeler
September 17, 2007
Page 2

| HOSPITAL | CITY | STATE |
|---|---|---|
| South Shore Hospital | South Weymouth | MA |
| St. Anne's Hospital | Fall River | MA |
| Lowell General Hospital | Lowell | MA |
| Brigham Women Hospital | Boston | MA |
| Caritas Good Samaritan Medical | Brockton | MA |
| Metro West Medical Center | Natick | MA |
| Emerson Hospital | Concord | MA |
| Falmouth Hospital | Falmouth | MA |
| Massachusetts General Hospital | Boston | MA |
| Beverly Hospital | Beverly | MA |
| Boston Medical Center | Boston | MA |
| Saints Memorial Medical Center | Lowell | MA |
| Metrowest Heart Center | Framingham | MA |
| Leonard Morse Campus Metrowest | Natick | MA |
| Cape Cod Hospital | Hyannis | MA |
| Caritas Carney Hospital | Dorchester | MA |
| Caritas St Elizabeths Medctr Of | Boston | MA |
| Caritas St Elizabeths Of Brighton | Brighton | MA |
| The Heart Center Of Metrowest | Framingham | MA |
| Charlton Memorial Hospital | Fall River | MA |
| Newton Wellesley Hospital | Newton Lower Falls | MA |
| Jordan Hospital | Plymouth | MA |
| Lahey Clinic Hospital | Burlington | MA |

You further agreed in Section 3 of the Agreement that you would not use or disclose MEDTRONIC confidential information for the benefit of anyone other than Medtronic. You further agreed you would not render services in a capacity that would involve the use, disclosure or reliance on CONFIDENTIAL INFORMATION or be induced or required to use, disclose, or rely upon CONFIDENTIAL INFORMATION during the course of rendering such services. CONFIDENTIAL INFORMATION is defined in paragraph 1.3 as follows:

any information relating to MEDTRONIC's business, including a formula, pattern, compilation, program, device, method, technique, or process, that the Employee learns or develops during the course of Employee's employment by MEDTRONIC that derives independent economic value from not being generally known, or readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use. CONFIDENTIAL INFORMATION includes but is not limited to trade secrets and INVENTIONS and, without limitation, may relate to research, development, experiments, clinical investigations, clinical trials, engineering, product specifications, computer programs, computer software, hardware configurations, manufacturing processes, compositions, algorithms, know-how, methods, machines, management systems and techniques, strategic plans, business methods, nonpublic financial information, proprietary and CONFIDENTIAL INFORMATION pertaining to vendors and

Ms. Brooke Keeler
September 17, 2007
Page 3

vendors and customers, employee and personnel data, sales volumes, pricing strategies, sales
and marketing plans and strategies, contracts and bids.

In addition, you also agreed in paragraph 4.2 that for one (1) year following your employment with
MEDTRONIC you will not solicit, cause to be solicited, or participate in or promote the solicitation of
any person to terminate that person's employment with MEDTRONIC or to breach that person's
employment agreement with MEDTRONIC.

Should you have any questions regarding the above information, please feel free to call me at (+1-707)
566-1643.

Sincerely,

MEDTRONIC, INC.

Alice Hwa
Senior Principal Human Resources Generalist
Endovascular Innovations

enc: Employee Agreement

# Exhibit F

F-
FY08 Vascular
(Endo/ogix/
Rotondo)

**Medtronic**

Medtronic Vascular
Endovascular Innovations
3576 Unocal Place
Santa Rosa, CA 95403
www.medtronic.com

707.525.0111

September 19, 2007

Mr. Albert Rotondo
55 Pine Street
Rockville Centre, NY 11570

Re: Post Employment Restrictions

Dear Al:

You recently left employment with Medtronic, Inc., and we understand that you are now providing services to Endologix, a competitor of Medtronic. This letter serves to remind you of the post-employment obligations you have to Medtronic, Inc. under the Medtronic Employee Agreement ("Agreement"), which you signed on December 29, 2006. A copy of that Agreement is enclosed for your review.

You agreed in paragraph 4.1 of that Agreement since you had no management duties or responsibilities during the last twelve (12) months of employment with MEDTRONIC, and since you were engaged exclusively in sales activities, including selling, soliciting the sale, or supporting the sale of MEDTRONIC PRODUCTS through direct contact with MEDTRONIC CUSTOMERS, you would be restricted for a duration of one (1) year after the last day you were employed by Medtronic. This restriction prohibits you from soliciting, selling to, contacting, or attempting to divert business from, whether directly or by managing, directing or supervising others, any MEDTRONIC CUSTOMER on behalf of a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH AND SUPPORT. CONFLICTING ORGANIZATION is defined in Paragraph 1.4 as:

> any person (including the Employee) or entity, and any parent, subsidiary, partner or affiliate (regardless of their legal form) of any person or entity, that engages in, or is about to become engaged in, the development, design, production, manufacture, promotion, marketing, sale, support or service of a COMPETITIVE PRODUCT or in COMPETITIVE RESEARCH AND SUPPORT.

MEDTRONIC CUSTOMER is defined in Paragraph 1.7 as:

> any person, entity or institution, including the employees, agents or representatives who controlled, directed or influenced the purchasing decisions of any such person, entity or institution, to whom or to which Employee sold, negotiated the sales, supported, marketed or promoted products or services on behalf of MEDTRONIC during the last one (1) year in which Employee was employed by MEDTRONIC.

*Alleviating Pain · Restoring Health · Extending Life*

Mr. Albert Rotondo
September 19, 2007
Page 2

As such, you are restricted from the following accounts for the purpose of selling or promoting
abdominal aortic aneurysm and peripheral products:

| HOSPITAL | CITY | STATE |
|---|---|---|
| St Francis Hospital | Roslyn | NY |
| Lutheran Medical Center | Brooklyn | NY |
| Wyckoff Heights Medical Center | Brooklyn | NY |
| Peninsula Hospital Center | Far Rockaway | NY |
| Maimonides Medical Center | Brooklyn | NY |
| Flushing Hospital Medical Center | Flushing | NY |
| Binc Kings Highway Division Medical | Brooklyn | NY |
| Brooklyn Hospital Center | Brooklyn | NY |
| New York Methodist Hospital | Brooklyn | NY |
| North Shore U Hospitals | New Hyde Park | NY |
| New York Hosp And Medical Ctr Of | Flushing | NY |
| North Shore U Hospital Forest Hills | Forest Hills | NY |
| Staten Isl North & South Campus | Staten Island | NY |
| Suny Downstate Medical University | Brooklyn | NY |
| Coney Island Hospital | Brooklyn | NY |
| Long Beach Medical Center | Long Beach | NY |
| Long Island Jewish Schneider | New Hyde Park | NY |
| Vamc 527 Brooklyn | Brooklyn | NY |
| Huntington Hospital | Long Island | NY |
| Brookhaven Memorial Medical Center | East Patchogue | NY |
| Richmond University Medical Center | Staten Island | NY |
| Winthrop University Hospital | Mineola | NY |
| Good Samaritan Hospital Medical | West Islip | NY |
| Southside Hospital | Bayshore | NY |
| St Catherine Of Siena Hospital | Smithtown | NY |
| Suny University Stony Brook | Stony Brook | NY |
| Vamc 632 Northport | Northport | NY |
| New-Island Hospital | Bethpage | NY |
| John T Mather Memorial Hospital | Port Jefferson | NY |
| North Shore U Hospital Plainview | Plainview | NY |
| Kings County Hospital Center | Brooklyn | NY |

You further agreed in Section 3 of the Agreement that you would not use or disclose MEDTRONIC
CONFIDENTIAL INFORMATION for the benefit of anyone other than Medtronic. You further agreed
you would not render services in a capacity that would involve the use, disclosure or reliance on
CONFIDENTIAL INFORMATION or be induced or required to use, disclose, or rely upon
CONFIDENTIAL INFORMATION during the course of rendering such services.   CONFIDENTIAL
INFORMATION is defined in paragraph 1.3 as follows:

any information relating to MEDTRONIC's business, including a formula, pattern,
compilation, program, device; method, technique, system, plan, or process, that the

Mr. Albert Rotondo
September 19, 2007
Page 3

Employee learns or develops during the course of Employee's employment by
MEDTRONIC that derives independent economic value from not being generally
known, or readily ascertainable by proper means, by other persons who can obtain
economic value from its disclosure or use.   CONFIDENTIAL INFORMATION
includes but is not limited to trade secrets and INVENTIONS and, without limitation,
may relate to research; development; experiments; clinical investigations; clinical trials;
clinical and product development results and data; engineering; product specifications;
computer programs; computer software; hardware configurations; manufacturing
processes; compositions; algorithms; know-how; methods; machines; management
systems and techniques; strategic plans; long-range plans; operating plans;
organizational plans; financial plans; financial models; financial projections; nonpublic
financial information; business, financial, planning, and strategic systems and methods;
operating systems; information systems; acquisition and divestiture goals, plans,
strategies or targets; regulatory strategies, plans and approaches; quality control
systems and techniques; patent and intellectual property strategies, plans and
approaches; vendor and customer data; employee and personnel data; human resources
goals, plans and strategies; human resource management techniques; sales volumes;
pricing strategies; sales and marketing plans and strategies; contracts and bids; and any
business management techniques that are being planned or developed, utilized or
executed by MEDTRONIC.

In addition, you also agreed in paragraph 4.2 that for one (1) year following your employment with
MEDTRONIC you will not solicit, cause to be solicited, or participate in or promote the solicitation of
any person to terminate that person's employment with MEDTRONIC or to breach that person's
employment agreement with MEDTRONIC.

Should you have any questions regarding the above information, please feel free to call me at (707) 566-
1643.

Sincerely,

MEDTRONIC, INC.

Alice Hwa
Senior Principal Human Resources Generalist
Endovascular Innovations

enc:  Employee Agreement